IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:                          )
                                )   Chapter 11
HECHINGER INVESTMENT COMPANY    )
OF DELAWARE, et al.,            )   Case no. 99-02261 (PJW)
                                )   through 99-002283
            Debtors.            )   Jointly Administered
_____    )
                                )
THE LIQUIDATION TRUST OF        )
HECHINGER INVESTMENT COMPANY    )
OF DELAWARE, INC.,              )
                                )
            Plaintiff,          )
                                )
      v.                        )   Civ. No. 00-840-SLR
                                )
FLEET RETAIL FINANCE GROUP,     )
et al.,                         )
            Defendants.         )

---

Michael Bonkowski, Esquire and Mark Minuti, Esquire of Saul Ewing LLP, Wilmington, Delaware.  Counsel for Plaintiff.  Of Counsel: David M. Friedman, Esquire, David E. Ross, Esquire, Howard W. Schub, Esquire, Andrew K. Glenn, Esquire, Ian D. Katz, Esquire and Marvin C. Peguese, Esquire of Kasowitz, Benson, Torres & Friedman LLP, New York, New York.

John L. Reed, Esquire and Matt Neiderman, Esquire of Duane Morris LLP, Wilmington, Delaware.  Counsel for Defendant Chase.  Of Counsel: Richard W. Clary, Esquire and Elizabeth Grayer, Esquire of Cravath, Swaine & Moore LLP, New York, New York.

Kenneth J. Nachbar, Esquire of Morris Nichols Arsht & Tunnell, Wilmington Delaware.  Counsel for Individual Defendants.  Of Counsel: Gibson, Dunn & Crutcher LLP, New York, New York.

Regina A. Iorii, Esquire of Ashby & Geddes, Wilmington, Delaware.  Counsel for Defendant Leonard Green & Partners L.P.  Of Counsel: Tony Castanares, Esquire, Stephan M. Ray, Esquire, Pamala J. King, Esquire, Gina M. Najolia, Esquire of Stutman, Treister & Glatt, Los Angeles, California.

Stephen M. Miller, Esquire and Carl N. Kunz, III, Esquire of Morris, James, Hitchens & Williams LLP, Wilmington, Delaware and Teresa K.D. Currier, Esquire and Peter J. Duhig, Esquire of Klett Rooney Lieber & Schorling, P.C., Wilmington, Delaware. Counsel for Defendant Fleet Retail and General Electric Capital Corporation.

_____

**MEMORANDUM OPINION**

Dated:   July 19, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.  INTRODUCTION

This case is an adversary proceeding initiated in connection with the bankruptcy petition filed in June 1999 by Hechinger Company and its affiliates ("Hechinger") under Chapter 11 of the Bankruptcy Code.  The court has jurisdiction to hear the matter pursuant to 28 U.S.C. § 1334(b).

Pending before the court are motions for summary judgment filed at the close of discovery by each of the remaining defendant groups sued by plaintiff,[1] the Liquidation Trust of Hechinger Investment Company of Delaware, Inc.  Plaintiff's claims arise out of the acquisition and subsequent combination of the assets of Builders Square, Inc. ("Builders Square") with Hechinger by defendant Leonard Green & Partners, L.P. ("Leonard Green") in September 1997 ("the Transaction").  Defendant The Chase Manhattan Bank ("Chase") represents a group of 22 lenders (the "Chase Lenders Group") which provided interim financing as part of the Transaction and established a $600 million secured credit facility for the combined entity.  In March 1999, the Chase Lenders Group assigned its entire interest in the credit facility to a syndicate led by defendant Fleet Retail Finance

---

[1]By virtue of prior rulings of the court, plaintiff no longer has extant claims against June R. Hechinger, Nancy Hechinger Lowe, Sally Hechinger Rudoy, Catherine S. England, Richard England, Jr., June L.P., Lois Associates L.P., and Jarsan Associates L.P.  (D.I. 131, 194)

Group ("Fleet").  The individual defendants[2] were all nine members of the Hechinger Board of Directors at the time the Transaction was consummated in September 1997 (collectively, the "Director Defendants").

Several of plaintiff's claims are based on the assertion that Hechinger was insolvent at the time of the Transaction or was rendered insolvent as a result of the Transaction, and that certain of the defendants knew or should have known of Hechinger's insolvency.  In claim one, plaintiff asserts that, by virtue of Hechinger's insolvency, the Director Defendants owed to Hechinger and its creditors a duty of undivided loyalty in managing and supervising the business affairs of Hechinger, including the duty to preserve and maximize the value of Hechinger's assets for the benefit of such creditors.[3]  In claim four, plaintiff asserts that Leonard Green aided and abetted the Director Defendants' breach because it knew or should have known

---

[2]Defendants John W. Hechinger, Jr., S. Ross Hechinger, and John W. Hechinger, Sr. (now deceased) were the controlling shareholders of Hechinger through their family's majority voting stake.  Defendant W. Clark McClelland was Hechinger's CFO and defendant Kenneth J. Cort was Hechinger's President and COO. Defendants Robert S. Parker, Ann D. Jordan, Alan J. Zakon, and Melvin A. Wilmore were outside directors.

[3]Plaintiff's claims two (by which a breach of fiduciary claim is asserted against the Hechinger family defendants) and three (by which an unjust enrichment claim has been asserted against the Hechinger family defendants) have been dismissed against all but those family members who also served on the Board of Directors.  (D.I. 189)

2

that approving the Transaction would be a violation of the Director Defendants' fiduciary duties to the corporation and its creditors.

Claims six through twelve are fraudulent conveyance claims asserted against the Director Defendants, Leonard Green and Chase and Fleet (collectively, the "Bank Defendants").[4] The underlying factual contention for these claims is that Hechinger received less than reasonably equivalent value in exchange for the Builders Square acquisition, the payments to Hechinger's stockholders and the payment of transaction fees to Leonard Green and the Bank Defendants. In claim thirteen, plaintiff seeks the equitable subordination of the Bank Defendants' claims.[5]

## II.   STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec.

---

[4]Plaintiff's claims six and seven have been dismissed as to all the Hechinger family defendants save for those family members who served on the Board of Directors.

[5]Since filing its amended complaint, plaintiff has stated that it is not asserting that Chase's claims should be subordinated. (D.I. 638 at 137, n.78)

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct." Horowitz v. Fed. Kemper
Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted).  If the moving party has demonstrated an
absence of material fact, the nonmoving party then "must come
forward with 'specific facts showing that there is a genuine
issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R.
Civ. P. 56(e)).  The court will "view the underlying facts and
all reasonable inferences therefrom in the light most favorable
to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63
F.3d 231, 236 (3d Cir. 1995).  The mere existence of some
evidence in support of the nonmoving party, however, will not be
sufficient for denial of a motion for summary judgment; there
must be enough evidence to enable a jury reasonably to find for
the nonmoving party on that issue. See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249 (1986).  If the nonmoving party
fails to make a sufficient showing on an essential element of its
case with respect to which it has the burden of proof, the moving
party is entitled to judgment as a matter of law. See Celotex
Corp. v. Catrett, 477 U.S. 317, 322 (1986).

4

## III.  RIGHT TO JURY TRIAL

The Seventh Amendment of the United States Constitution[6] provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  Suits in common law are those in which legal rights are to be determined, as opposed to suits where equitable rights alone are recognized and equitable remedies are administered.  Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41 (1989).  "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."  Chauffeurs, Teamsters & Helpers, Local 391 v. Terry, 494 U.S. 558, 565 (1990).  Federal law determines whether a suit is legal or equitable, even when the cause of action is created by state law. Simler v. Conner, 372 U.S. 221, 222 (1963).

The Supreme Court has identified a three-step analysis for determining whether a particular action is a "Suit at common law[.]"  First, courts must compare the statutory action to 18th-century actions brought in English courts prior to the merger of courts of law and equity.  Granfinanciera, 492 U.S. at 42. Second, a court must examine the remedy sought and determine

---

[6]The parties have only discussed the Seventh Amendment in connection with plaintiff's right to a jury trial for its claims. (D.I. 610 at 51-52; D.I. 616 at 1-3; D.I. 638 at 176-78)

whether it is legal or equitable in nature. <u>Id.</u> This second step of the analysis is more important than the first. <u>Id.</u> Third, if, on balance, the first two factors indicate a claim is entitled to a jury trial, courts must decide whether Congress may assign and has assigned resolution of the claim "to a non-Article III adjudicative body that does not use a jury as a factfinder." <u>Id.</u> Under this step, "[t]he filing of a proof of claim in [a] bankruptcy case may convert the action from one that is essentially a plenary action at law to one that is part of the claims allowance and disallowance process, which is purely equitable in nature." 5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 548.11 (15th ed. 2004); <u>see also</u> <u>Billing v. Ravin, Greenberg & Zackin, P.A.</u>, 22 F.3d 1242, 1247 (3d Cir. 1994).

### A.   Breach of fiduciary duty

"Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'-- carrying with them no right to trial by jury."[7] <u>In re Evangelist</u>, 760

---

[7]Plaintiff argues that the underlying theory of its breach of fiduciary duty claim is negligence, a tort that is legal in nature. (D.I. 638 at 179-80)  However, the language plaintiff points to in its amended complaint for support of this argument does not explicitly state negligence is the basis of either of its breach of fiduciary duty claims.  Furthermore, this language is required to state a claim for breach of fiduciary duty. <u>Omnicare, Inc. v. NCS Healthcare, Inc.</u>, 809 A.2d 1163, 1169 (Del. Ch. 2002).  If such language made a breach of fiduciary duty claim legal in nature, then every breach of fiduciary duty claim would be characterized as legal.  The court rejects plaintiff's

F.2d 27, 29, 31 (1st Cir. 1985) (Breyer, J.); see also Terry, 494
U.S. at 567; In re Hutchinson, 5 F.3d 750, 757 (4th Cir. 1993);
In re Jensen, 946 F.2d 369, 371 (5th Cir. 1991), abrogated on
other grounds by Conn. Nat'l Bank v. Germain, 503 U.S. 294
(1992); In re Carter Paper Co., 220 B.R. 276, 303 (Bankr. M.D.
La. 1998); In re Lands End, 193 B.R. 426, 433 (Bankr. D.N.J.
1996); In re Sunshine Trading & Transp. Co., 193 B.R. 752, 757
(Bankr. E.D. Va. 1995); In re Elegant Equine, 155 B.R. 189, 191-
93 (Bankr. N.D. Ill. 1993); In re Globe Parcel Service, Inc., 75
B.R. 381, 385 n.9 (Bankr. E.D. Pa. 1987).

In Delaware, breach of fiduciary duty claims are routinely
heard in its chancery court, which is a court of equity.
Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163 (Del. Ch.
2002); Clark v. Teeven Holding Co., Inc., 625 A.2d 869, 875 (Del.
Ch. 1992) (Chancery "still retains jurisdiction to hear nearly
all the claims for breach of a fiduciary duty"). While federal,
not state law, governs whether plaintiff's breach of fiduciary
duty claim is entitled to a jury trial, the well-established
precedent in Delaware of trying breach of fiduciary duty cases in
a court of equity reinforces the common law tradition affording
courts of equity jurisdiction over these matters.

The remedy sought by plaintiff is also equitable.  Plaintiff
has alleged that the Director Defendants, in approving the

-----------------------

argument.

leveraged buyout of Hechinger and the acquisition of Builders
Square, ensured "the removal of at least $127 million of value
from Hechinger by cashing out themselves . . . ."[8]  (D.I. 651,
Ex. 9 at ¶ 99, 108)  Plaintiff also has alleged that the Director
Defendants' approval of the Transaction "deprived" Hechinger and
its unsecured creditors of at least the value of the amounts paid
to Hechinger's shareholders.  (Id. at ¶¶ 99, 101, 108, 110)
Plaintiff has requested that the Director Defendants "reimburse
the Debtors' estates."  (Id. at ¶¶ 102, 111)  Damages "are
considered to be equitable relief if they are restitutionary in
nature - that is, they would restore the status quo and return a
sum rightfully belonging to another."  Alexander v. Primerica
Holdings, Inc., 819 F. Supp. 1296, 1309 (D.N.J. 1993); see also
Terry, 494 U.S. at 570.  Since plaintiff's breach of fiduciary
duty claim and its requested remedy are both equitable, the court
concludes that plaintiff does not have a right to trial by jury
for this claim.[9]

---

[8]In Pereira v. Farace, the Second Circuit overturned the
district court's denial of a jury trial for a breach of fiduciary
duty claim because the district court "improperly characterized
the Trustee's damages as restitution."  No. 03-5035, 2005 WL
1532318, at *9 (2d Cir. June 30, 2005).  However, in Pereira "the
officers and directors never personally possessed any of the
disputed funds".  2005 WL 1532318, at *7.  Plaintiff's amended
complaint alleges that the Director Defendants did possess the
disputed funds.  Thus, Farace does not alter this court's
conclusion that the remedy sought by plaintiff is equitable.

[9]Because the court grants the Director Defendants' motion to
strike plaintiff's jury demand, it does not address the

**B.    Fraudulent conveyance**

When a creditor files a proof of claim against the bankruptcy estate, the creditor loses his or her right to a jury trial for that claim. Langenkamp v. Culp, 498 U.S. 41, 45 (1990); see also Katchen v. Landy, 382 U.S. 323, 336 (1966); cf. Granfinanciera, 492 U.S. at 58-59 & n.14.  Such an action triggers the process of allowance and disallowance of the claim, thereby subjecting the creditor to the bankruptcy court's equitable power.  Id.  The Third Circuit has examined a debtor's right to a jury trial in a similar context.  Billing, 22 F.3d at 1242.  In Billing, Ravin, Greenberg & Zackin served as bankruptcy counsel for the debtors.  Id. at 1243.  After the attorneys filed a claim in the bankruptcy court, the debtors objected, claiming the attorneys had engaged in legal malpractice.  Id.  The debtors then filed a separate malpractice action in district court and invoked their right to a jury trial under the Seventh Amendment. Id.  According to the Court, the close connection between the debtors' malpractice suit and their objections to the attorneys' application for fees with the bankruptcy court "leads us to conclude that the debtors' allegations of malpractice are part of the process of allowance and disallowance of claims." Id. at 1252.

_____

alternative motion to try the Director Defendants separately from the other defendants.  (D.I. 616)

9

In the present matter, Hechinger sought protection under Chapter 11 of the Bankruptcy Code. (D.I. 602, Ex. 72 at A-1825 to A-1826)  Pursuant to 11 U.S.C. § 521(1), Hechinger filed schedules identifying the Bank Defendants' claims.[10]  (D.I. 604, Ex. 132 at A-2721)  These schedules did not identify the Bank Defendants' claims as contested, unliquidated, or disputed.[11] (Id.)  Subsequently, Hechinger filed a voluntary motion in the bankruptcy court seeking an order authorizing Hechinger to obtain credit and incur debt in order to continue its business operations. (D.I. 602, Ex. 73 at A-1859 to A-1861)  The bankruptcy court granted Hechinger's motion, but allowed plaintiff 120 days to file objections to claims against Hechinger's bankruptcy estate. (Id. at A-1864 to A-1865)  On May 26, 2000, plaintiff filed an objection, alleging that the liens

---

[10]These schedules do not identify the Bank Defendants. (D.I. 604, Ex. 132 at A-2721)  Nevertheless, the schedules, together with the bankruptcy court's final order authorizing post-petition secured superpriority financing, indicate that the schedules included the Bank Defendants' claims. (Id.; D.I. 602, Ex. 73 at A-1861 to A-1862)

[11]Plaintiff argues that because the Bank Defendants did not file a proof of claim, plaintiff's fraudulent conveyance claims were not converted into equitable claims in bankruptcy. (D.I. 638 at 190-91)  Creditors holding claims scheduled pursuant to 11 U.S.C. § 521(1) that are not identified as disputed, contingent, or unliquidated are not obligated to file a proof of claim. Fed. R. Bankr. P. 3003(b)(1), 3003(c)(2).  "A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) . . . except a claim or interest that is scheduled as disputed, contingent, or unliquidated." 11 U.S.C. § 1111. The court rejects plaintiff's argument.

10

secured by defendant Chase and assigned to defendant Fleet were fraudulent conveyances.  (Id. at A-1855)  On September 1, 2000, plaintiff filed a complaint against the Bank Defendants.  (D.I. 602, Ex. 74)  On April 3, 2001, plaintiff amended its complaint to include claims that the Transaction and payments made in connection with the Transaction were fraudulent conveyances. (D.I. 651, Ex. 9 at 48-52)  The court concludes that plaintiff's subsequently filed fraudulent conveyance suit mirrors its objection to the Bank Defendants' claims.  Consequently, plaintiff's fraudulent conveyance claims are part of the process of allowance and disallowance of claims and are not entitled to a jury trial.  Billing, 22 F.3d at 1252.

Furthermore, the remedy sought by plaintiff is equitable in nature.  Plaintiff seeks avoidance of its obligation to repay the Bank Defendants' loans and avoidance of the Bank Defendants' security interests.[12]  (D.I. 651, ex. 9 at 48-52)  These remedies

_____

[12]Plaintiff also requests avoidance, recovery and preservation of the money debtors paid to the Bank Defendants. (D.I. 651, ex. 9 at 48-51)  However, recovery of this money is entirely contingent on granting the equitable relief of avoidance of the obligation to repay the Bank Defendants' loans.  Thus, plaintiff's monetary relief cannot be obtained without the aid of equitable relief.  Furthermore, although plaintiff purports to request monetary damages (D.I. 638 at 187-89), its request of monetary damages is more accurately characterized as disgorgement.  (D.I. 602, Ex. 72 at A-1825, A-1864)  Disgorgement has traditionally been an equitable remedy.  Tull v. United States, 481 U.S. 412, 424 (1987).  Plaintiff's request for avoidance, recovery and preservation of the money debtors paid to the Bank Defendants does not constitute a legal remedy.

11

constitute equitable relief.  In re Weinstein, 237 B.R. 567, 574
(Bankr. E.D.N.Y. 1999); Garrett Rd. Supermarket, Inc. v. Wetterau
Fin. Co., 95 B.R. 904, 905 (E.D. Pa. 1989).  That plaintiff's
requested relief is equitable supports the conclusion that
plaintiff is not entitled to a jury trial on its fraudulent
conveyances claims.

    In sum, plaintiff's objection to the Bank Defendants' claims
triggered the claim resolution process.  Furthermore, the relief
plaintiff requested for its fraudulent conveyance claims is
equitable.  Consequently, the court concludes that plaintiff is
not entitled to a jury trial on its fraudulent conveyances
claims.

## IV.  COLLAPSING THE TRANSACTION

    The Third Circuit has recognized that multi-step
transactions similar to the Transaction can be collapsed when the
steps of the Transaction are "part of one integrated
transaction."  United States v. Tabor Realty Corp., 803 F.2d
1288, 1302 (3d Cir. 1986); see also Voest-Alpine Trading USA
Corp. v. Vantage Steel Corp., 919 F.2d 206, 212-13 (3d Cir.
1990); HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir.
1995) (stating that collapsing a transaction is most frequently
applied to "lenders who have financed leveraged buyouts of
companies that subsequently become insolvent").  The court has
previously noted that, when considering this issue, it would

12

focus "'not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction.'" Hechinger Inv. Co. Of Del. v. Fleet Retail Fin. Group, 274 B.R. 71, 91 (D. Del. 2002); see also HBE Leasing Corp., 48 F.3d at 635-36; Tabor Realty, 803 F.2d at 1303; In re Sunbeam Corp., 284 B.R. 355, 370 (S.D.N.Y. 2002).

In this case, the steps of the Transaction should be collapsed and considered jointly as one transaction.  The Director Defendants,[13] the Bank Defendants[14] and Leonard Green[15] all knew about the multiple steps of the transaction.  Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent and merge Builder's Square and Hechinger.  Therefore, in evaluating the validity of the Transaction, the court considers it as one transaction.[16]

---

[13](D.I. 649, Ex. 2 at HECH 396-400; D.I. 648, Ex. 1)

[14](D.I. 652, Ex. 4 at 1, Ex. 1 at 3-1 to 3-2)

[15](D.I. 650, Ex. 14; D.I. 647, Ex. 34 at 97)

[16]This conclusion is supported by the description of the Transaction accompanying the proxy statement distributed to Hechinger stockholders, where the Hechinger stockholders were asked to approve and adopt

> the Agreement and Plan of Merger, dated as of July 17, 1997 (the "Original Merger Agreement), as amended as of August 27, 1997 (as so amended, the "Merger Agreement"), by and among Hechinger, BSQ Acquisition, Inc., a Delaware corporation ("BSQ Acquisition"), and Hechinger Acquisition, Inc., a Delaware corporation

13

───────────────

("Acquisition"), pursuant to which Acquisition will
merge with and into Hechinger (the "Merger").  BSQ
Acquisition and Acquisition are recently formed
corporations and are indirect wholly owned subsidiaries
of Green Equity Investors II, L.P. ("GEI").  As a result
of the Merger, Hechinger will be the surviving
corporation and will become a wholly owned subsidiary
of Acquisition.  Pursuant to the Merger, each share
of Common Stock issued and outstanding immediately
prior to the effective time of the Merger . . . will be
converted in to the right to receive $2.375 in cash,
without interest.  Approval of the Merger Agreement and
consummation of the Merger will cause the interests of
current holders of Common Stock (the "Stockholders") in
the future operations of Hechinger to cease.  After
consummation of the Merger, Hechinger's outstanding public
indebtedness will continue to remain outstanding.

Concurrently with the execution of the Original
Merger Agreement, BSQ also entered into a Purchase and
Sale Agreement, dated as of July 17, 1997 ("the BSQ
Acquisition Agreement"), with Kmart Corporation, a
Michigan corporation, and Builders Square, Inc., a
Delaware corporation ("Builders Square"), pursuant to
which BSQ Acquisition will purchase all of the outstanding
capital stock of a recently formed, wholly owned
subsidiary of Builders Square (to which substantially all
assets and liabilities relating to the business of
Builders  Square will be transferred).  **Since GEI plans to
combine the businesses and operations of Hechinger and
Builders Square, it is a condition to the closing of the
Merger Agreement that the transactions contemplated by the
BSQ Acquisition Agreement shall have been consummated or
shall be consummated substantially concurrently with the
transaction contemplated by the Merger Agreement and vice
versa.**

(D.I. 646, Ex. 1 at A-1639)(emphasis added)

## V.   BREACH OF FIDUCIARY DUTIES[17]

Under Delaware law, "directors do not owe creditors duties beyond the relevant contractual terms absent 'special circumstances . . . e.g., fraud, insolvency, or a violation of a statute. . . .'"   Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 787 (Del. Ch. 1992) (quoting Harff v. Kerkorian, 324 A.2d 215, 222 (Del. Ch. 1974), rev'd in part on other grounds, 347 A.2d 133 (Del. 1975)).   If a company reaches the point of insolvency, the directors

> continue to have the task of attempting to maximize the economic value of the firm. That much of their job does not change.  But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end.  By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders - that of residual risk-bearers.  Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.

Prod. Res. Group, L.L.C. v. NCT Group, Inc., C.A. No. 114-N, 2004 WL 2647593, at *13 (Del. Ch. Nov. 17, 2004); see also Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., Civ. A. No. 12150, 1991 WL 277613, at *34 & n.55 (Del. Ch. Dec. 30,

---

[17]The court concludes that the breach of fiduciary claims were timely asserted under 11 U.S.C. § 108(a), and that plaintiff has standing to bring this litigation on behalf of the corporation.

1991) ("[W]here a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residual risk bearers, but owes its duty to the corporate enterprise", including the corporation's creditors); <u>Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc.</u>, 178 B.R. 956, 968-69 (D. Del. 1994).

The first issue of material fact that must be addressed, therefore, is whether Hechinger was insolvent or was operating in the vicinity of insolvency at the time of the Transaction.  In order to make this determination, the court looks to the Bankruptcy Code.  Section 101(32) of Title 11 defines "insolvent" as a "financial condition such that the sum of [a corporation's] debts is greater than all of such entity's property, at a fair valuation. . . ."  The Bankruptcy Code does not mandate what constitutes a "fair valuation"; however, in the context of determining insolvency under 11 U.S.C. § 548(a)(1)(B)(ii)(I), the Third Circuit has stated that "[w]here bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis."  <u>Moody v. Sec. Pacific Bus. Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992).[18]  Moreover, because valuation is, to a

---

[18]As stated above, plaintiff has also asserted fraudulent conveyance claims against certain of the defendants.  It makes sense for the insolvency analysis to be consistent vis a vis the Transaction as a whole, as opposed to different analyses being applied to the same facts to accommodate different claims.

great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to "prevailing marketplace values", see Peltz v. Hatten, 279 B.R. 710, 738 (D. Del. 2002), rather than to values created with the benefit of hindsight for the purpose of litigation.

With this analytical framework in mind, the court concludes, first, that bankruptcy was not "clearly imminent" in September 1997, as it cannot be disputed that Hechinger continued to operate and satisfy all of its obligations to its creditor constituency for well over a year subsequent to the Transaction. Therefore, the assets of Hechinger should be valued on a going concern basis.

Despite the thousands of pages of exhibits submitted in connection with this motion practice, it remains unclear to the court whether any party conducted such an analysis.  For instance, plaintiff relies on the expert opinion of Dr. Israel Shaked.  Dr. Shaked's expert report comprises an exhaustive recitation of data that allegedly was known or knowable at the time of the Transaction.  (D.I. 642-45)  However, none of the data in the report is specifically referenced to any of the exhibits, and Dr. Shaked's actual valuation analyses (as opposed to his conclusions) are contained on a one page summary of data attached to his report.  (D.I. 642, Ex. 1 at Attach. 3)  It is plaintiff's burden to prove that the Director Defendants owed a

17

duty to the creditors by proving that Hechinger was operating in
the vicinity of insolvency.  There are genuine issues of material
fact in this regard.

Assuming for purposes of this motion practice that Hechinger
was operating in the vicinity of insolvency, the next issue of
material fact that must be addressed is the nature and extent of
the duty owed to Hechinger's creditors by the Director
Defendants.  Because "the fact of insolvency does not change the
primary object of the directors' duties, which is the firm
itself", "the business judgment rule remains important and
provides directors with the ability to make a range of good
faith, prudent judgments about the risks they should undertake on
behalf of troubled firms."  Prod. Res. Group, 2004 WL 2647593 at
*13 & n.53.  The business judgment rule "posits a powerful
presumption in favor of actions taken by the directors in that a
decision made by a loyal and informed board will not be
overturned by the courts unless it cannot be 'attributed to any
rational business purpose.'"  Cede & Co. v. Technicolor, Inc.,
634 A.2d 345, 361 (Del. 1993).  Therefore, a party challenging a
board decision "has the burden at the outset to rebut the rule's
presumption" by proving that the directors breached "any one of
the triads of their fiduciary duty – good faith, loyalty or due
care."  Id.  If the challenging party meets this burden of proof,
the burden shifts to the defendant directors "to prove to the

18

trier of fact the 'entire fairness' of the transaction," that is, "that the transaction was the product of both fair dealing **and** fair price."  Id. (emphasis added); see also Krasner v. Moffett, 826 A.2d 277, 287 (Del. 2003).[19]

In this case, plaintiff asserts that the Director Defendants breached their duty of loyalty to Hechinger and its creditors. "A breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction or the director 'derived any personal financial benefit from it in the sense of **self-dealing**, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'" Nebenzahl v. Miller, Civ. A. No. 13206, 1993 WL 488284, at *3 (Del. Ch. Nov. 8, 1993) (citing Cede & Co. v. Technicolor, Inc.,

-----

[19]According to the Delaware Supreme Court,

> [t]he concept of fairness has two aspects:  fair
> dealing and fair price.  The former embraces questions
> of when the transaction was timed, how it was
> initiated, structured, negotiated, disclosed to the
> directors, and how the approvals of the directors and
> the stockholders were obtained.  The latter aspect of
> fairness relates to the economic and financial
> considerations of the proposed merger, including all
> relevant factors:  assets, market value, earnings,
> future prospects, and any other elements that affect
> the intrinsic or inherent value of a company's
> stock. . . .  However, the test for fairness is not
> a bifurcated one as between fair dealing and price.
> All aspects of the issue must be examined as a whole
> since the question is one of entire fairness.

Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1162-63 (Del. 1995) (quoting Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983)).

634 A.2d at 363).  It is generally recognized "that the question
of when director self-interest translates into board disloyalty
is a fact-dominated question, the answer to which will
necessarily vary from case to case", as the finder of fact "must
have flexibility in determining whether an officer's or
director's interest in a challenged board-approved transaction is
sufficiently material to find the director to have breached his
duty of loyalty and to have infected the board's decision."  Cede
& Co. v. Technicolor, Inc., 634 A.2d at 364.[20]

The proxy statement distributed to the Hechinger
stockholders disclosed "that certain members of the Hechinger
Board and Hechinger management ha[d] certain interests that
[were] in addition to the interests of Stockholders generally,
including the payments to be made in respect of options of
Hechinger in connection with the Merger Agreement, severance
arrangements, other stock incentive arrangements and retirement
plans which contain provisions that would be triggered by a
change of control of Hechinger."  (D.I. 602, Ex. 71 at 27)
Plaintiff more specifically asserts that defendants John W.
Hechinger, Jr., John W. Hechinger, Sr., and S. Ross Hechinger
controlled the votes for approximately 65% of the voting shares
of Hechinger stock, for which they and their family received

---

[20]Plaintiff does not aver that the outside directors engaged
in self-dealing; nor is there an allegation that any of the
Director Defendants appeared on both sides of the Transaction.

approximately $21 million as a result of the Transaction.   In
addition to the family stockholdings, John W. Hechinger, Jr.
received approximately $6.6 million for "change of control"
benefits, including personal stock options, SERP payments,
severance, vacation pay and related excise taxes.  Defendants
McClelland and Cort likewise received "change of control"
benefits.  At least several of these benefits were implemented at
a time when a change in control was contemplated, if not
imminent.  For these reasons, the court concludes that there are
genuine issues of material fact as to whether the Director
Defendants breached their duty of loyalty to Hechinger and its
creditors.[21]  Under these circumstances, the Director Defendants
should be prepared to carry their burden to prove at trial that
the Transaction passes muster under the entire fairness standard.

Plaintiff also asserts that Leonard Green aided and abetted
the Director Defendants in breaching their fiduciary duties.  "A
third party may be liable for aiding and abetting a breach of a
corporate fiduciary's duty to the stockholders if the third party
'knowingly participates' in the breach."  Malpiede v. Townson,
780 A.2d 1075, 1096 (Del. 2001) (citation omitted).  The court
has found, however, that the Transaction was negotiated in good

---

[21]The exculpatory provisions of a certificate of
incorporation cannot foreclose a claim for a breach of the duty
of loyalty.  See Cinerama, Inc. v. Technicolor, Inc., 663 A.2d at
1166.

faith and at arm's length.  "]A]rm's-length negotiations are
inconsistent with participation in a fiduciary breach." Id. at
1098.  Therefore, plaintiff's aiding and abetting claims against
defendant Leonard Green fail as a matter of law and Leonard
Green's motion for summary judgment shall be granted as to claims
four and five.

## VI.  FRAUDULENT CONVEYANCE

Plaintiff argues that the Transaction is avoidable under 11
U.S.C. § 548(a), as a fraudulent conveyance.  The defendants
contend that the Transaction is not avoidable because they acted
without any fraudulent intent or knowledge of the alleged
fraudulent nature of the Transaction.

### A.   Intentional Fraudulent Conveyance

The Transaction can be avoided if plaintiff proves, by a
preponderance of the evidence, that the Transaction was either
intentionally or constructively fraudulent.  See Peltz v. Hatten,
279 B.R. 710, 736 (D. Del. 2002); see also HBE Leasing Corp. v.
Frank, 48 F.3d 623, 636 (2d Cir. 1995).  To prove that the
Transaction was intentionally fraudulent, plaintiff must show
that the Transaction was perpetrated "with actual intent to
hinder, delay or defraud" creditors.  11 U.S.C. § 548(a)(1).
Direct evidence of fraudulent intent, however, is often
unavailable and courts usually rely on circumstantial evidence,
including the circumstances of the transaction, to infer

fraudulent intent.   <u>See, e.g.</u>, <u>In re Victor Int'l, Inc.</u>, 97 Fed.
Appx. 365, 369 (3d Cir. 2004); <u>Moody v. Sec. Pacific Bus. Credit,
Inc.</u>, 971 F.2d 1056, 1064 (3d Cir. 1992), <u>affirming</u> <u>Moody v. Sec.
Pacific Bus. Credit, Inc.</u>, 127 B.R. 958, 991 (Bankr. W.D. Pa.
1991).   When evaluating the circumstances of a transaction,
courts have relied on "badges of fraud" that include: (1) the
relationship between the debtor and the transferee; (2)
consideration for conveyance; (3) insolvency or indebtedness of
the debtors; (4) how much of the debtor's estate was transferred;
(5) reservation of benefits, control or dominion by the debtor;
and (6) secrecy or concealment of the transaction.   <u>Moody v. Sec.
Pacific Bus. Credit, Inc.</u>, 127 B.R. 958, 991 (Bankr. W.D. Pa.
1991); <u>In re Otis & Edwards, P.C.</u>, 115 B.R. 900, 913 (Bankr. E.D.
Mich. 1990).

In this case, plaintiff has failed to carry its burden of
proof or to identify any genuine issues of material fact that
either the Bank Defendants or Leonard Green intended to defraud
creditors by transferring funds from Hechinger's bankruptcy
estate.   The record demonstrates that these defendants believed
the Transaction would create a viable company, capable of
competing in the do-it-yourself market that had been taken over
by the larger Lowe's and Home Depot. (D.I. 598, Ex. 13 at A-265-
67, Ex. 10, Ex. 4 at A86-91; D.I. 600, Ex. 46 at A1124, Ex. 44 at
A1067, A1074; D.I. 601, Ex. 54 at A1269, A1284, Ex. 56 at A1312,

A1313-19, Ex. 62 at A1463, Ex. 63 at A1479)  Furthermore, the
record demonstrates that these defendants believed the company
created by the Transaction would be able to meet its financial
obligations as they became due.  (Id.)  There is no evidence that
these defendants kept the Transaction secret.  There was no
incestuous relationship between these defendants and Hechinger.
As the court has previously found, these defendants were third
parties who negotiated the Transaction in good faith and at arm's
length.[22]  Therefore, the Bank Defendants' and Leonard Green's
motions for summary judgment are granted with respect to
plaintiff's intentional fraudulent conveyance claims.

The record is not as clear with respect to certain of the
Director Defendants (John Hechinger, Sr., John Hechinger, Jr., S.
Ross Hechinger, Kenneth J. Cort and W. Clark McClelland)[23]

_____

[22]Plaintiff argues the Fleet's creditor claims should be
subordinated pursuant to 11 U.S.C. § 510(c).  Most courts will
utilize this section to subordinate a creditor's claim if it is
shown that the creditor:  (1) "engaged in some type of
inequitable conduct, (2) the misconduct . . . resulted in injury
to the creditors or conferred an unfair advantage on the
claimant, and" (3) equitable subordination of the claim would not
be "inconsistent with the provisions of the bankruptcy code."
Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured
Claims, 160 F.3d 982, 986-87 (3d. Cir. 1998); see also Eastern
Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 333 n.2 (3d Cir.
2000).  Plaintiff has not carried its burden of proof or shown
that there is a genuine issue of material fact with respect to
any inequitable conduct on the part of the Bank Defendants.  The
court grants Fleet's motion for summary judgment as to this
claim.

[23]Plaintiff has failed to carry its burden of proof or to
identify genuine issues of material fact with respect to the

because there is evidence from which a fact finder could infer fraudulent intent.  First, the Transaction may not have been completely disclosed to all of the directors.  (D.I. 646, Ex. 24 at 107; D.I. 648, Ex. 1; D.I. 598, Ex. 13 at 169)  Second, the majority of directors may have been "interested" directors. (D.I. 646, Ex. 16 at 152, Ex. 22 at 423-24)  The Transaction was approved by the directors without any formal uninterested director committee.  (Id.; D.I. 646, Ex. 13 at 560-62)  Third, those Director Defendants who were also officers of Hechinger benefitted substantially from the transaction, as prior to the Transaction the Board of Directors increased their severance packages.  (D.I. 647, Ex. 37, Ex. 24 at 199, Ex. 16 at 205-06, 215-16; D.I. 648, Ex. 18 at § 3)  These Director Defendants' severance packages were enhanced, despite the fact that there was no concern that any of these Director Defendants would terminate his employment prior to the completion of the Transaction.  (Id.)

For these reasons, the Director Defendants' motion for summary judgment, with respect to plaintiff's claims of intentional fraudulent conveyance, is denied as to Director

---

outside Director Defendants (Ann D. Jordan, Robert S. Parker, Melvin A. Wilmore and Alan J. Zakon).  Even if plaintiff successfully proves that the Transaction is avoidable, it cannot recover from the outside Director Defendants because it has failed to establish that these Director Defendants were either the "initial transferee[s] . . . or entit[ies] for whose benefit such transfer was made . . . ."  11 U.S.C. § 550.  Therefore, the Director Defendants' motion for summary judgment is granted with respect to these outside Director Defendants.

Defendants John Hechinger, Sr., John Hechinger, Jr., S. Ross Hechinger, Kenneth J. Cort and W. Clark McClelland.

### B.   Constructive Fraudulent Conveyance

Plaintiff would have the burden at trial to prove, by a preponderance of the evidence, that the Transaction was constructively fraudulent because it occurred without Hechinger's receiving an equivalent value in exchange for the transfer of assets **and** Hechinger was undercapitalized **or** became insolvent as a result of the Transaction.  See 11 U.S.C. § 548(a)(2). Therefore, the court must determine if Hechinger received any value and, then, it must determine whether that value exceeded the assets that Hechinger gave up.  See In re R.M.L., Inc., 92 F.3d 139, 149 (3d Cir. 1996).  Value is calculated not only based on tangible assets; intangible assets "although incapable of precise measurement," can also confer value on Hechinger.  Id.

In this case, plaintiff has not presented credible evidence to refute the fact that Hechinger received value through the Transaction in the form of expected synergy between Hechinger and Builders Square.  Individually, Hechinger and Builders Square were losing market share via their competition with Lowe's and Home Depot, in part, because Lowe's and Home Depot were larger. (See, e.g., D.I. 649, Ex. 1)  The merger of Hechinger and Builders Square created a bigger company with the opportunity to compete on a scale with Lowe's and Home Depot.  (D.I. 650, Ex. 5

at K 009941, Ex. 9; D.I. 603, Ex. 89 at A2379)   In addition, the combination of the companies created an "expense synergy" that reduced the overhead costs of running the business.   (Id.)   This expected synergy between the two companies created value that was added to Hechinger's bankruptcy estate.   See In re R.M.L., Inc., 92 F.3d at 150 (recognizing the value of expected synergy between two merged companies, even though the synergy never became a reality).

Furthermore, the Transaction resulted in a line of credit for Hechinger.   (D.I. 646, Ex. 9 at 53; D.I. 650, Ex. 14)   This "ability to borrow money [is of] considerable value in the commercial world."   In re R.M.L., Inc., 92 F.3d at 149.   Loan funds were also used to pay off one of Hechinger's creditors, CIT.

Finally, the new combined Hechinger accumulated assets from both Hechinger and Builders Square.   The court has already found that after the Transaction, Builders Square's assets were worth $260 million.   (D.I. 606, Ex. 178)

Plaintiff has failed to carry its burden of proof or to identify genuine issues of material fact relating to whether the assets Hechinger expended in the Transaction were worth more than the value it received from the Transaction.   Plaintiff points to documentation that Hechinger and Builders Square individually were not performing well prior to the Transaction and that the

27

merged company was also unsuccessful in the market.  However, this does not have any relevance to valuing the assets either received or lost through the Transaction.  Plaintiff refers to the money paid to shareholders in exchange for their shares (approximately $127 million) as being value lost that was never compensated.  (D.I. 638 at 114; D.I. 651, Ex. 9 at ¶¶ 99, 108) This amount, however, is less than the value of the Builders Square assets that Hechinger received through the Transaction. Plaintiff only cites the conclusory statement by its expert that Hechinger did not receive equivalent value and does not cite evidentiary support for this expert's opinion.  (D.I. 642, Ex. 1)

Likewise, plaintiff has failed to carry its burden of proof or to identify genuine issues of material fact relating to whether Hechinger received equivalent value for the fees paid to Leonard Green.  Leonard Green's expert concluded, based on work performed by Leonard Green and industry standards, that Hechinger received "reasonably equivalent value for the payment of the . . . management fees."  (D.I. 492 at 7-8; D.I. 646, Ex. 3 at 170-71)  As part of its management duties for which it was paid, Leonard Green expended a "significant amount of effort" in refinancing the Transaction, monitoring Hechinger, putting four members of Leonard Green on Hechinger's Board of Directors after the Transaction and hiring a new chief executive.  Id.  Plaintiff has not come forward with any evidence to contradict this expert

28

opinion, nor any evidence that Leonard Green did not perform its management duties or that such performance was not worth what Leonard Green was paid.[24]

Because plaintiff has failed to carry its burden of proof or to identify genuine issues of material fact as to whether Hechinger received unequivalent value, defendants' motions for summary judgment with respect to constructive fraudulent transfers are granted.

## VII. CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied.

Leonard Green's motion for summary judgment is granted as to claims four (aiding an abetting the Director Defendants' breach of their fiduciary duties), eight (intentional fraudulent conveyance), nine (constructive fraudulent conveyance) and ten (the Transaction fees paid amounted to a fraudulent conveyance).

The Director Defendants' motion for summary judgment is denied as to claim one.  Their motion for summary judgment as to claim six is granted as to Ann D. Jordan, Robert S. Parker,

---

[24]Plaintiff also argues that Hechinger did not receive equivalent value for the fees that it paid Chase.  Plaintiff's argument is predicated on the Transaction being a fraudulent transfer.  (D.I. 638 at 131 ("If the loans that Hechinger obtained from Chase are avoidable as fraudulent transfers, the fees paid to finance such fraudulent transfers are avoidable.")) Because the court finds that the Transaction was not avoidable, the fees paid to Chase are also not avoidable.

Melvin A. Wilmore and Alan J. Zakon, but denied as to John Hechinger, Sr., John Hechinger, Jr., S. Ross Hechinger, Kenneth J. Cort and W. Clark McClelland.  The Director Defendants' motion for summary judgment is granted as to claim seven (constructive fraudulent conveyance).

The Bank Defendants' motions for summary judgment are granted as to claims ten (intentional fraudulent conveyance), twelve (constructive fraudulent conveyance) and thirteen (equitable subordination).

Furthermore, for the reasons stated, claims one and six shall be tried via a bench trial.

An order consistent with this memorandum opinion shall issue.